

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 7, 2017

**ASHLEY BRADSHAW v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-04854    J. Robert Carter, Jr., Judge**

———————————

**No. W2016-01692-CCA-R3-PC**

———————————

The petitioner, Ashley Bradshaw, appeals the denial of post-conviction relief from her 2013 Shelby County Criminal Court jury convictions of aggravated child abuse, aggravated child neglect, and aggravated child endangerment, for which she received a sentence of 20 years. In this appeal, the petitioner contends only that she was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

John R. Marek, Memphis, Tennessee, for the appellant, Ashley Bradshaw.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Shelton Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Shelby County Criminal Court jury convicted the petitioner of three counts each of aggravated child abuse, aggravated child neglect, and aggravated child endangerment. The trial court merged all of the convictions into a single count of aggravated child abuse and imposed a sentence of 20 years to be served at 100 percent by operation of law. This court affirmed the convictions on direct appeal. *See State v. Ashley Bradshaw*, No. W2014-00175-CCA-R3-CD (Tenn. Crim. App., Jackson, Feb. 9, 2015), *perm. app. denied* (Tenn. May 18, 2015).

In *Ashley Bradshaw*, this court stated the facts of the case as follows:

This case stems from the injuries received by S.B.[] on April 26, 2012. A Shelby County grand jury indicted [the petitioner], S.B.'s mother, for three counts of aggravated child abuse, three counts of aggravated child neglect, and three counts of aggravated child endangerment. The three counts of each offense reflect three alternate theories for the aggravating factor: that the victim received serious bodily injury; that a deadly weapon was used; and that the act of abuse/neglect was "especially heinous, atrocious or cruel, or involved the infliction of torture to the victim." [T.C.A.] § 39-15-402(a)(1)-(3).

At [the petitioner's] September 2013 trial, Memphis Police [Department ("MPD")] Officer Gregory Turner testified that he was dispatched to LeBonheur Children's Hospital on April 26, 2012, for a child abuse call. The complainant was a social worker, Regina Morris, who reported that the two- or three-year-old victim had blisters on her vaginal area, leg, and buttocks and also had possible burns. When Officer Turner arrived, the hospital staff had already dressed the victim's injuries. Officer Turner testified that [the petitioner] was in the victim's room, and he asked her what happened. [The petitioner] told Officer Turner that she had placed the victim "in the tub to take a bath" and that she left the room for five minutes, returning when "she heard a loud yelling and screaming from the tub." [The petitioner] told him that the victim "had turned on the hot water and scalded herself." [The petitioner] removed the victim from the tub and took her to LeBonheur. Officer Turner testified that [the petitioner] was initially calm but that when officers asked her to leave the victim's room, "she became kind of irate and stat[ed] to officers that she didn't want to talk anymore and [they] need[ed] to leave her alone."

On cross-examination, Officer Turner testified that he also spoke to Kelvin Arnold, Jr., (later identified as [the petitioner's] boyfriend) while he was at LeBonheur and that Mr. Arnold reported the same scenario as [the petitioner].

[MPD] Officer Jeffrey Alan Garey, a crime scene investigator, testified that he was dispatched to LeBonheur on

April 26, 2012, to take pictures in a possible child abuse case. When he entered the victim's room, she "was laying [sic] on her back, appeared to be in distress[,] and she was heavily bandaged and had a few tubes in her." The bandages were around her waist, genital area, and lower legs. Officer Garey asked a nurse to remove the bandages so that he could photograph the injuries. However, because the removal of the bandages caused the victim pain and distress, the nurse stopped the bandage removal. Officer Garey proceeded to take photographs of the injuries he could see. Officer Garey characterized the injuries as "severe water blisters." He testified that he also saw "welt marks" on the victim's thighs, which he photographed as well. The photographs he took of S.B. were published to the jury.

[MPD] Officer Sam Blue, a crime scene investigator, testified that an investigating officer sent him to the residence where the victim was injured to take measurements and photographs. Officer Blue testified that the bathtub at the residence measured five feet long, two and a half feet wide, and eleven inches deep. He measured the water temperature after running the water for thirty seconds and found that the water was 100 degrees. He drained the tub and ran the water for sixty seconds, after which the water was 118 degrees. Officer Blue said he attempted to take a photograph of the water heater's gauge but because of the location of the water heater, he could only photograph the gauge from its side and could not determine with certainty the gauge's setting.

*Id.*, slip op. at 2-3. MPD Lieutenant Myron Lawrence spoke with the petitioner and Mr. Arnold at LeBonheur, and the petitioner recited the same set of facts regarding the victim's injuries as she had to Officer Turner. *Id.*, slip op. at 3. Lieutenant Lawrence stated that the petitioner became extremely angry and cursed at the officers when she was asked to leave the victim's hospital room. *Id.* Lieutenant Lawrence viewed the victim's injuries and described them as "'severe burns on her lower extremities[,] [g]enital area[], [and] buttock area[].'" *Id.* Lieutenant Lawrence also observed what appeared to be "'belt loop mark[s]'" which had "'healed up.'" *Id.* Lieutenant Lawrence spoke with the petitioner again, and because of her high level of agitation, inquired whether the petitioner had a history of mental problems. *Id.* The petitioner responded that she had previously been diagnosed with depression, prompting Lieutenant Lawrence to request a "Crisis Intervention Team" officer to speak with her. *Id.* That officer concluded that the

petitioner "'did not meet the criteria to be transported to a mental institution,'" and Lieutenant Lawrence again attempted to speak with the petitioner. *Id.* Because the petitioner was still "'too irate'" to communicate with Lieutenant Lawrence, he requested the intervention of the Department of Children's Services ("DCS"). *Id.* At that point, a DCS worker reported to the hospital and took custody of both the victim and her brother. *Id.*

Latisha Garcia, the victim's primary nurse during the victim's time in the emergency department, testified as follows:

> [T]he victim had "severe burns to her lower extremities and to her buttocks area and her vaginal area." Ms. Garcia said that she administered "a tremendous amount of pain medication" to the victim but that "[i]t was extremely hard to control her pain." Ms. Garcia also gave the victim an intravenous drip for fluids, dressed her injuries, covered her in a blanket for warmth, and inserted a catheter. She explained that the victim was able to verbalize that she needed to urinate but would not urinate on her own, thus requiring Ms. Garcia to catheterize her. When she inserted the catheter, she discovered that the victim also had "additional injuries . . . on the inside of the vaginal area." Ms. Garcia recalled that [the petitioner] was in the room and that she encouraged [the petitioner] to "be with [the victim] and touch her" and "talk to her," but [the petitioner] did not do so. Ms. Garcia testified that [the petitioner] told the victim to be quiet on several occasions. Ms. Garcia told [the petitioner] that the victim was in pain, but according to Ms. Garcia, [the petitioner] did not appear distressed that her child was in pain. Ms. Garcia testified that she was present when police officers came to photograph the victim's injuries. She began removing the victim's dressings, but "the skin started to come off with the dressing." They decided to stop taking pictures because removing the dressings "hurt [the victim] so much." Ms. Garcia explained that her treatment of the victim ceased after the victim was admitted into the hospital, but she knew that the victim would receive a debridement treatment – "[e]ssentially, a scrubbing of the skin" – each day. Ms. Garcia testified that the debridement procedure was so painful that patients had to be sedated. Ms. Garcia said that the hospital's social workers were always called in when a child

came to the hospital with burns. The social workers were responsible for contacting DCS if necessary.

On cross-examination, Ms. Garcia testified that when she first encountered the victim, she noticed the victim's reddened skin; blisters had not yet formed. Ms. Garcia agreed that the victim was brought to the hospital soon after being burned but that because blisters form at different rates, she could not give a specific time frame for the time between the victim's being burned and her arrival at the hospital. Ms. Garcia said that she did not notice other marks on the victim at that time. She only saw the victim one other time, the following day, and no one else was with the victim at that time.

On re-direct examination, Ms. Garcia testified that while she did not see any marks on the victim when she first saw her, she later saw "loop marks" that followed a "[v]ery distinct pattern," which she associated with a beating. She said that the hospital staff "see[s] loop marks all the time."

*Id.*, slip op. at 4-5.

DCS Special Investigator Kisa Johnson testified that when she spoke with the petitioner, the petitioner stated that "the victim had turned on the hot water by herself." *Id.*, slip op. at 5. Ms. Johnson noticed that the petitioner was "upset with the police officers but exhibited no other emotion." *Id.*

Mr. Arnold's mother, Sheila Renice Arnold, testified that the petitioner and her children had been staying at her house when the burning incident occurred. *Id.* Mrs. Arnold described the victim as "'an average little two[-]year-old. Hyper and happy.'" *Id.* Mrs. Arnold also stated that the victim was in the process of toilet-training. *Id.* Mrs. Arnold testified that she had never experienced any difficulty adjusting the water in the bathtub and that she had not "had any work done on the water heater either before or after the victim was injured." *Id.* On cross-examination, Mrs. Arnold "agreed that the water became hot very fast in her bathtub" and that Mr. Arnold "occasionally bathed [the petitioner's] children." *Id.*

Doctor Karen Lakin, Assistant Professor of Pediatrics at the University of Tennessee and Medical Director of LeBonheur's Child Advocacy Resource and Evaluation Services program, testified as an expert in the area of pediatrics with a

specialty in child abuse pediatrics. *Id.*, slip op. at 6. Doctor Lakin first visited the victim on April 27 prior to the victim's initial debridement treatment. *Id.* Doctor Lakin described the victim's injuries as "'very, very obvious burns to [] her lower extremities and to . . . the perineal area, which is the genital area, and her buttocks area,'" in addition to "'bruising in the form of . . . very linear loop marks on her thighs.'" *Id.* With respect to the burns, Doctor Lakin classified them as "'partial thickness burns,' also known as 'second degree burns where blisters or bullous start to form.'" *Id.* Doctor Lakin testified that the victim experienced more serious burns on her right leg and that the "burns 'completely encircle[d]' the victim's feet, ankles, and lower part of her legs." *Id.* Photographs of the victim's injuries were published to the jury. *Id.*

When Doctor Lakin first encountered the victim, her condition was critical because the two-year-old had received burns over approximately 20 percent of her body, which Doctor Lakin explained was particularly dangerous in young children due to the risk of infection. *Id.* "Illustrative of the dangers of infection, [Doctor] Lakin said that the victim became septic during her hospitalization and had to be transferred to the intensive care unit." *Id.* Doctor Lakin testified that the victim was forced to undergo skin grafts on her right leg and had to wear compression garments to assist the skin as it healed. *Id.*

> [Doctor] Lakin opined that based on the severity of the victim's burns, it "would be unlikely to have occurred by a two[-]year-old independently on her own." She said that the history of the injuries as documented by the emergency room physicians was not consistent with the pattern of burning. [Doctor] Lakin highlighted the fact that the victim had deep burns on both legs. She opined that "a child her age would have been able to get out if she was beginning to be burned unless . . . there was something preventing her from getting out and getting away." She explained that a child who is burned accidentally would generally only be burned on one side rather than both. In addition, the depth of the victim's burns [was] significant because the depth of the burns was "related to the length of time that [the] tissue is exposed." [Doctor] Lakin testified that the victim "had very, very deep, extensive burns." [Doctor] Lakin opined, based on the burn pattern, that the victim's feet and perineum were in the water but that her knees were drawn up. She further opined that "if [the victim] [were] trying to move or trying to squirm, then that could explain how more of one side is going to get burned than the other." [Doctor] Lakin noted that the burn pattern did not match the history given to the emergency

department – that the victim "was in the tub with water running and she was facing the water, the faucet" – because children burned "by water pouring down the front of them" would have injuries to the "anterior portion of the thighs[,] the perineal area[,] . . . [and] [t]he stomach, chin[], and shoulder."

*Id.*, slip op at 6-7.

Doctor Lakin also opined that "it would take more than a minute in 118-degree water for a partial thickness burn to result." *Id.*, slip op. at 7. Doctor Lakin stated that, in her opinion, the victim's injuries were not accidental, basing that opinion on "the loop marks 'caused by a looped cord being struck on the skin'"; the extent of the burning to the victim's perineum; the "circumferential nature of the burns that indicated 'an immersion'"; the "bilateral nature of the burning"; and the amount of time it would have taken for burns to form "when immersed in the hypothetical 118-degree water." *Id.* Doctor Lakin testified that one of the victim's family members had reported to her that the victim "had had a bowel movement after she had taken a bath and then was being cleaned up," which was significant to Doctor Lakin because she often looked "'for a stressful event that may have precipitated an abusive event.'" *Id.*

On cross-examination, Doctor Lakin stated that she learned of the bowel movement from "either the victim's aunt or grandmother," neither of whom were present when the victim was burned. *Id.*, slip op. at 7-8. At the conclusion of Doctor Lakin's testimony, the State "brought the victim before the jury to display her burns, essentially as demonstrative evidence." *Id.*, slip op. at 8. The petitioner did not testify and presented no evidence on her own behalf. *Id.*

On March 9, 2016, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that she was deprived of the effective assistance of counsel. Following the appointment of counsel and the amendment of the petition, the post-conviction court conducted an evidentiary hearing on June 23, 2016.

At the evidentiary hearing, the petitioner testified that trial counsel was ineffective by failing to call Mr. Arnold as a witness at trial and by effectively convincing her not to testify in her own defense. With respect to Mr. Arnold, the petitioner stated that she and trial counsel had discussed using him as a witness but that, prior to trial, counsel informed her that "his job was to defend" the petitioner and that if Mr. Arnold testified, then "he would end up in jail incarcerated because he already ha[d] a violent record." The petitioner believed that Mr. Arnold was a "key witness" because he "was the one who put [the victim] in the tub and ran the water." The petitioner insisted that

she never told anyone that she had placed the victim in the bathtub on the day in question. The petitioner testified that she was "shocked" that trial counsel presented no proof at her trial and stated that she would have testified had she known that counsel did not intend to offer any proof.

With respect to plea offers, the petitioner recalled that trial counsel had relayed to her an offer of "fifteen years at thirty percent" if she would agree to plea as a Range II offender. The petitioner explained that she rejected the offer because she "felt like [she] had good grounds" and knew that she "was innocent." If she had known, however, that counsel would present no proof at her trial, then she "absolutely" would have accepted that offer.

The petitioner also stated that, at some point prior to trial, she "wrote letters" to the court requesting a new attorney and that, when those efforts failed, she sought to represent herself. According to the petitioner, the trial judge inquired whether the petitioner "really want[ed] to represent [her]self," and the petitioner responded in the affirmative, but she surmised that the court "took it as a joke" because she "was never able to represent" herself.

On cross-examination, the petitioner conceded that she had two prior convictions for theft and "[m]aybe trespassing." The petitioner acknowledged that, at trial, a witness for the State testified that the petitioner told an emergency room physician that she had placed the victim in the bathtub, but the petitioner denied telling her mother that she had placed the victim in the bathtub "because she had defecated on herself."

The petitioner agreed that, sometime prior to the victim's injuries, she had voluntarily committed herself to a mental health facility due to depression, but she denied that the reason for the commitment was due to her fear that she "was going to hurt [her] kids," despite the indications to the contrary in the facility's records. The petitioner adamantly denied that she had ever hurt her children but conceded that she did not have custody of her children at the time of the victim's injuries. The petitioner insisted that a friend "who was keeping [the victim] at the time" had inflicted the loop mark injuries; that the friend's first name was Darvalyn; and that she did not know Darvalyn's last name.

When asked if Mr. Arnold was responsible for the victim's burns, the petitioner responded thusly:

I'm not saying – I'm not going to say he was the one who burned her but he was the one who placed her in the tub

and ran the water to give her a bath. But he's not the one who burned her accidentally, I wouldn't say that.

The petitioner agreed that she had taken the stand at the close of the State's proof at trial and had informed the trial court that she did not wish to testify. She explained that she was following the advice of trial counsel, who had told her that "it would be best if [she] didn't testify." The petitioner also agreed that trial counsel had discussed the "pros and cons of people testifying" on her behalf and that counsel had informed her that it would be a "[b]ad idea" for her witnesses to testify due to credibility issues.

Trial counsel testified that he had practiced law for 12 to 13 years and that he spent "in excess of a year or maybe even longer" representing the petitioner. Trial counsel spoke with Mr. Arnold at the conclusion of the petitioner's arraignment and obtained Mr. Arnold's contact information, continuing to speak with him "periodically" until closer to the trial date. Initially, Mr. Arnold indicated that "he was the individual giving the bath to" the victim when she was injured and that "the water got extremely hot." Trial counsel stated that photographs of the bathtub showed a "spindle knob" which would have been simple for a child to turn, supporting the case theory that the burning was accidental. As the trial date approached, trial counsel found it increasingly difficult to contact Mr. Arnold, and counsel eventually served a subpoena on Mr. Arnold at his probation office. A few days before trial, Mr. Arnold contacted trial counsel and arranged a meeting, at which time he told trial counsel "some things that [he] didn't think would help [the petitioner] at trial." Trial counsel later expounded on this statement, agreeing that Mr. Arnold had, "[i]n so many words," told trial counsel that the petitioner had injured the victim by stating that "he wasn't" in the bathroom and that the petitioner "was around." Trial counsel decided not to call Mr. Arnold as a witness because his testimony would have directly implicated the petitioner, giving her "an opportunity to do it, the motive to do it[,] and the means." When asked if he had informed the petitioner of the decision not to call Mr. Arnold as a witness, trial counsel responded in the affirmative.

Trial counsel testified that, after he received the records from the petitioner's time at the mental health facility, he "was shocked at first at what they had stated" and was concerned about "how to approach a defense of them." Trial counsel argued successfully to prevent the State from introducing those records at trial, but he was concerned that "a tricky response" from the petitioner on the witness stand "could open a door" to the admission of the records. Trial counsel also discussed the petitioner's past criminal record with her in conjunction with her decision to testify. Ultimately, the petitioner's decision not to testify was "made with [trial counsel's] co-counsel and [the petitioner] over numerous conferences."

Although he could not recall the specifics, trial counsel testified that the State had made an offer to the petitioner that he believed was "fifteen years at a hundred percent."

Trial counsel and his two co-counsel visited the petitioner at the jail "on numerous occasions" to interview her and prepare her for trial. Counsel stated that the petitioner was "involved intimately" in preparing for trial, reviewing all evidence, and selecting the jury. Trial counsel did not recall the petitioner's request for a new attorney or her expression of a desire to represent herself.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence that trial counsel's performance was deficient or prejudicial, noting that the petitioner had failed to provide the testimony of Mr. Arnold and that the court could not simply "speculate on what that witness's testimony would have been." The post-conviction court found that the record of the petitioner's trial "clearly demonstrate[d]" that the petitioner did not wish to testify and that the "defense pursued a reasonable trial strategy (the injury was an accident) that ultimately was unsuccessful" through no fault of trial counsel.

In this appeal, the petitioner reiterates her claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to present the testimony of Mr. Arnold at trial, by failing to offer proof that the victim's injuries were accidental, by failing to communicate appropriately with the petitioner such that she could make an informed decision about whether to testify, and by failing to assist the petitioner in her quest to either procure new counsel or represent herself. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record overwhelmingly supports the ruling of the post-conviction court. The petitioner's three-sentence arguments regarding her wish for new counsel or the opportunity to represent herself, along with her contention that trial counsel failed to show that the injuries were accidental, are not supported by argument, citation to authorities, or citation to the record; thus, both issues have been waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to

authorities, or appropriate references to the record will be treated as waived in this court."). In any event, trial counsel testified that he did not recall the petitioner's having requested new counsel or the opportunity to proceed pro se, and the post-conviction court implicitly accredited that testimony. Furthermore, the post-conviction court explicitly accredited trial counsel's reasonable defense strategy of an accidental burning, and we will not "second-guess a reasonably based trial strategy." *Adkins*, 911 S.W.2d at 347.

Regarding the testimony of Mr. Arnold, the petitioner failed to present him as a witness at the evidentiary hearing. As such, we cannot speculate how he might have testified at trial. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Finally, with respect to the petitioner's claim that she was not adequately informed about the decision of whether she should testify, the post-conviction court found that the record of the petitioner's trial "clearly demonstrated" that she did not wish to testify, and the petitioner has failed to provide this court with a transcript of her *Momon* colloquy. In the absence of a complete record of what transpired in the lower court, we must presume that the post-conviction court's rulings are supported by sufficient evidence and affirm that court's judgment. *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). As such, we hold the petitioner has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial.

The petitioner failed to establish that she was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE